**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HARJIT MAHIL, an individual, | ) Case No.: 3:20-cv-01559-BEN-MDD |
| Plaintiff, | ) |
| | ) **ORDER:** |
| v. | ) |
| | ) **(1) DEFENDANT'S MOTION FOR** |
| OPTION CARE ENTERPRISES, INC., a | ) **PARTIAL SUMMARY JUDGMENT** |
| Delaware corporation, | ) **IS DENIED; and** |
| Defendant. | ) |
| | ) **(2) THE PARTIES' MOTIONS TO** |
| | ) **FILE UNDER SEAL ARE GRANTED** |
| | ) |
| | ) **[ECF Nos. 36, 37, 45]** |

I.    <u>**INTRODUCTION**</u>

Plaintiff Harjit Mahil ("Plaintiff") brings this action against Defendant Option Care Enterprises, Inc. ("Defendant") for various violations of the Family and Medical Leave Act (the "FMLA"), California's Family Rights Act ("CFRA"), and California's Fair Employment and Housing Act ("FEHA").   ECF No. 1.   Before the Court is: (1) Defendant's Motion for Partial Summary Judgment, ECF No. 36; (2) Defendant's Motion to File Documents Under Seal, ECF No. 37; and (3) Plaintiff's Motion to File Documents Under Seal, ECF No. 45.

The Motions were submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1) and Rule 78(b) of the Federal Rules of Civil Procedure.  ECF No. 58.  After considering the papers submitted, supporting documentation, and applicable law, the Court (1) **DENIES** Defendant's Motion for Partial Summary Judgment; and (2) **GRANTS** both parties' Motions to File Documents Under Seal.

## II.   BACKGROUND

Plaintiff worked for Defendant as a clinical pharmacist and was terminated in January 2020.  Plaintiff now alleges several claims related to disability discrimination, retaliation, interference with medical leave, and wrongful termination.

### A.   Statement of Facts

On June 27, 2016, Plaintiff was diagnosed with Generalized Anxiety Disorder by Dr. Kaylan Graham.  Ex. 82 to Declaration of Jenna Rangel, ECF No. 44-3 ("Rangel Decl.") at 2;[1] Deposition of Dr. Kaylan Graham, 46-13 ("Graham Depo.") at 5.  The medical records read that Plaintiff was feeling anxious, overwhelmed, had trouble sleeping, and was constantly thinking/worrying about her job as a pharmacy intern and how everything was going to get done.  Ex. 82 to Rangel Decl. at 2.

Plaintiff was employed by Defendant as a non-exempt clinical pharmacist from March 27, 2017 through January 10, 2020.  Declaration of Lawrence Jefferson, ECF No. 36-4 ("Jefferson Decl.") at 3, ¶ 8; Declaration of Harjit Mahil, ECF No. 44-1 ("Mahil Decl.") at 2, ¶ 2.   Defendant provides in-home and alternate site infusion services nationwide.  Motion at 10; ECF No. 44 ("Oppo.") at 7.  Ruth Zau, who became pharmacy manager in February 2018, began supervising Plaintiff near the end of 2017.  Deposition of Ruth Zau, ECF No. 44-5 ("Zau Depo.") at 121–22, 129–30.  Vicky Lo also worked as a clinical pharmacist, and Vincent Sanque and Shirley Fernandez worked as pharmacy technicians.  *Id.* at 130.  Other employees included Kenny Williamson, who worked in the warehouse and intake specialists, Lory Zinggeler and Jason Quarles.  *Id.*

---

[1]      Unless otherwise indicated, all page number references are to the ECF-generated page number contained in the header of each ECF-filed document.

During the applicable time frame, Janette Elardo served as Defendant's Senior Director of Operations, and Lawrence Jefferson served as Defendant's Human Resources Business Partner.  Deposition of Janette Elardo, ECF No. 44-4 ("Elardo Depo.") at 4; Jefferson Decl. at 2, ¶ 4.

Plaintiff's 2018 Mid-Year Performance Review,[2] executed by Zau during October 2018, appears positive.  *See* Ex. 11 to Rangel Decl. at 13–15; Zau Depo. at 126.  Zau mentioned Plaintiff's good phone etiquette, efforts with patient documentation, and her ability to follow policies and procedures, laws, and USP standards.  Ex. 11 to Rangel Decl. at 13–14.  Zau also noted her appreciation that Plaintiff was not afraid to speak her mind regarding the work environment and morale.  *Id.* at 15.

Plaintiff's 2018 Annual Performance Review was entered on February 21, 2019, and Zau reiterates the same positive comments as those noted in Plaintiff's 2018 Mid-Year Review.  *See* Ex. 12 to Rangel Decl. at 17–20; Zau Depo. at 163–64.  Zau also noted Plaintiff's strong communication skills, her ability to put patients at ease, and that she had seen Plaintiff "grow so much in the last 6 months and . . . [was] very pleased with [her] progress."  Ex. 12 to Rangel Decl. at 17.

In late May 2019, there was an incident between Plaintiff and pharmacy technician, Vincent Sanque.  Ex. 42 to Rangel Decl. at 104.  Plaintiff alleged Sanque yelled[3] at her when she asked him for help, and Sanque claimed Plaintiff just sat at her desk while he did her job.  Ex. 42 to Rangel Decl. at 104; Ex. 77 to Rangel Decl. at 5; Ex. 55 to Jefferson Decl. at 28.  Both Plaintiff and Sanque relayed their version of the event (among other things) to Zau and in emails to Elardo.  Ex. 77 to Rangel Decl. at 5; Ex. 55 to Jefferson

---

[2]    In 2017, Plaintiff received positive Performance Reviews from her then supervisors, Sean O'Rourke and Scott Clench.  *See* Ex. 8 to Rangel Decl. at 2–5; Ex. 9 to Rangel Decl. at 7–11.

[3]    Zau reported that based on discussions with Kenny Williamson and Vicky Lo, Sanque did not yell at Plaintiff but his voice was louder than normal.  Ex. 77 to Rangel Decl. at 2.  Zau also said Plaintiff can come across a little abrasive due to her loud voice, but that Zau knew Plaintiff did not raise her voice at Sanque.  *Id.* at 3.

-3-

Decl. at 28–29; Elardo Depo. at 29–33.  Zau told Elardo she could see both sides, noting that while Plaintiff can be a little rough around the edges, Sanque takes no initiative, and that there had been other complaints about him.  Ex. 77 to Rangel Decl. at 2; Elardo Depo. at 33–34.  Zau stated Plaintiff asked Sanque for help more than others, but it was not wrong for her to do so.  Ex. 77 to Rangel Decl. at 2.  Zau stated she perceived Sanque's behavior as insubordination.  *Id.*

During a staff meeting in September or October 2019, Plaintiff "complained that employees were overworked, unable to take breaks due to the understaffing, mentioned a recent class action against Rite Aid for missed breaks, and complained about her own stress and anxiety relating to these issues."  ECF No. 36-9 at 9; *see also* Ex. 16 to Elardo Decl. at 4 (Zau stating that Plaintiff "cited examples of other companies such as Rite Aid and Kaiser, who have gone through lawsuits because their employees were not able to take their breaks.").  There is also a chat conversation between Plaintiff and Lori Zinggeler, where Plaintiff reports that she had been there all day with no break.  Ex. 86 to Mahil Decl. at 5.  When Plaintiff said she "swear[s] no one cares about you here," Zinggeler responded "I kmow [sic]!!"  *Id.*

On October 22, 2019,[4] Zau completed a Verbal Disciplinary Action form regarding two alleged incidents that occurred on October 16 and 18, 2019.  Ex. 14 to Rangel Decl. at 22; Zau Depo. at 174.  The report states on October 16, 2019, Plaintiff created a delivery ticket but failed to list the necessary tubing.  Ex. 14 to Rangel Decl. at 22.  A few days later, Zau had to have a stat driver deliver the tubing to the patient.  *Id.*  On October 18, 2019, Zau wrote that she asked Plaintiff to come in early "for scheduled repairs," and Plaintiff allegedly failed to check one delivery ticket and mislabeled another.  *Id.*  When Zau questioned Plaintiff about the situation, Zau alleges Plaintiff yelled loudly, "Ruth, I've been so busy with team D! I didn't even get to take my two 15-minute breaks!"  *Id.*

---

[4]    The Disciplinary Action form shows it was evaluated by Zau on October 22, 2019, but states it was entered by Zau on January 19, 2020, and entered by Jefferson on January 13, 2020.  Ex. 14 to Rangel Decl. at 22.

-4-

Two patient infusions were allegedly delayed because of Plaintiff's error.  *Id.*  On October 23, 2019,[5] Zau gave Plaintiff a verbal warning regarding the events.  Ex. 16 to Rangel Decl. at 33; Zau Depo. at 178.  Zau testified that all three incidents played a role in her writing up Plaintiff's Disciplinary Action, but the "biggest thing" was that Plaintiff yelled in the workplace.  Zau Depo. at 176.

Zau stated that after giving Plaintiff a verbal warning, Plaintiff asked for some time to calm down "and then asked to take the rest of the day off to see her MD to get anxiety meds."  Ex. 16 to Rangel Decl. at 28.  Zau observed Plaintiff crying before she left.  Zau Depo. at 183.  Plaintiff visited Dr. Graham that afternoon.  Ex. 82 to Rangel Decl. at 19. The medical records state Plaintiff suffered a panic attack at work, and that she reported trouble breathing, palpitations, and feeling overwhelmed.  *Id.*  Plaintiff told Dr. Graham that in addition to her pharmacy work, she was forced to do her warehouse manager's job, because he was out of town.  *Id.*  Plaintiff explained "[t]he day did not go well, deliveries did not get out on time," and Plaintiff felt that the verbal warning she received for what happened was unfair.  *Id.*

Zau asked Plaintiff to provide a medical note, which Plaintiff did.  *Id.*; Ex. 42 to Rangel Decl. at 119.  Plaintiff also informed Zau that her doctor "instructed her to take a few days off . . . ."  *Id.*; Ex. 16 to Rangel Decl. at 28.  On October 24, 2019, Zau emailed the note to Jefferson and Elardo.  Ex. 16 to Rangel Decl. at 28.  Zau expressed her belief that because Plaintiff was the only pharmacist scheduled for the next day, she was retaliating against Zau "by getting a MD note to cover today and tomorrow and choosing not to come in" knowing this would create huge problems.  *Id.*  Zau also complained that Plaintiff: (1) did not take direction well; (2) had yelled at Zau twice before; (3) had the most penalty pay from late/missed lunches; (4) sometimes complained about having to

---

[5]     The email thread between Zau, Jefferson, and Elardo discussing the verbal warning show that it occurred on October 24, 2019.  Ex. 16 to Rangel Decl. at 33.  However, the parties appear to agree the warning occurred on October 23, 2019, which is consistent with Plaintiff's visit to Dr. Graham on that day.  *See* Ex. 82 to Rangel Decl. at 19.

1    work overtime; and (5) "expressed anger at the company for giving her 'too much work

2    to be done in 7 hrs . . . .'" *Id.*  Zau further noted Plaintiff's prior comments about the Rite

3    Aid and Kaiser lawsuits, alleging Plaintiff was truly bringing down the morale of the

4    team.  *Id.*  Jefferson responded that Zau could not consider an employee seeing a physician

5    and being relieved of work duties as retaliation and asked why performance issues had

6    not been raised in the past.  *Id.* at 27.  Zau replied that she had been too nice in the past,

7    and the first time Plaintiff yelled at her was a year ago.  *Id.*  Zau stated she would document

8    all incidents going forward, but that not all incidents could "be written up, such as

9    complaining about the company during team meetings."  *Id.*

10        On October 25, 2019, Plaintiff sent Zau a text message stating she would not be

11   coming into work that day and attached another medical note from Dr. Graham.  Ex. 42

12   to Rangel Decl. at 119.  Zau sent the medical note to Jefferson and Elardo and told them

13   Plaintiff was "not coming in again."  Ex. 16 to Rangel Decl. at 26.  Zau stated she could

14   not imagine how "the verbal warning would cause this much anxiety," that Zau "was very

15   nice and reasonable with [Plaintiff]," and that Zau was "beyond words at this point."  *Id.*

16   The October 25, 2019 note from Dr. Graham read, "[Plaintiff] is a patient under my

17   professional care.  Please excuse her from work on 10/25/2019 for a medical illness."  *Id.*

18   at 30.

19        Plaintiff visited Dr. Graham again on October 29, 2019, who recommended

20   Plaintiff take medical leave—she wrote a note excusing Plaintiff from work between

21   October 30, 2019 and November 27, 2019.  Ex. 19 to Rangel Decl. at 16; Graham Depo.

22   at 27–28, 33–34.  Plaintiff claims she told Zau that her doctor recommended medical

23   leave, but that Plaintiff was choosing not to take it.  Mahil Depo. I at 52–53, 90–91; *see*

24   *also* Zau Depo. at 217–18.  Zau confirmed that Plaintiff asked about the company's

25   medical leave policy, Zau forwarded Plaintiff an email about medical leave, and Plaintiff

26   later informed Zau that she would not be taking leave.  Zau Depo. at 217–18.

27

28

Also on October 29, 2019,[6] Zau completed a second Disciplinary Action form regarding an incident that occurred on September 14, 2019.  Ex. 17 to Rangel Decl. at 36. Zau alleged Plaintiff put a patient's pharmacy work order in another patient's delivery items, which could have led to a HIPAA violation.  *Id.*  A nurse removed the wrong patient's work order before the other patient saw it.  *Id.*  Zau said Plaintiff was responsible for the error because she was the only pharmacist on call that weekend, and Plaintiff signed off on the delivery ticket.  *Id.*  Zau further wrote there is a two-person checking process that requires two people to sign off on the packing of patient paperwork.  *Id.*  Zau wrote Plaintiff "is expected to be more careful and to adhere to the double check packing process going forward," but it does not appear Plaintiff was made aware of the report.  *Id.* at 37.  Plaintiff claims she signed off on the drugs and supplies but did not sign off on the paperwork being correct, because she was interrupted.   Deposition of Harjit Mahil ("Mahil Depo. II"),[7] ECF No. 36-7 at 37.  Plaintiff alleges Kenny Williamson signed it, packed it up, and sent it out.  *Id.*  In the Disciplinary Action form, there is no mention of the other individual who should have signed off on the paperwork.  Ex. 17 to Rangel Decl. at 36.

On October 29, 2019, Vicky Lo emailed Zau reporting that on October 16, 2019, Plaintiff called Lo for advice on a patient but kept complaining about work and told Lo to go on stress leave.  Ex. 18 to Rangel Decl. at 40.  When Lo responded that she did not need or want to go on leave, she reports Plaintiff saying: "well, did you know you can go on stress leave and the company will pay for your time off? You can be off for months. We can take leave together, and when you take stress leave, [my daughter] will miraculously be sick during that time!"  *Id.*  Plaintiff also allegedly reported to Lo that she was documenting her missed 15-minute breaks and every time she feels "unhappy,"

---

[6]    Zau performed the evaluation on October 29, 2019, but the report states it was entered by Zau and Jefferson in January 2020.  Ex. 17 to Rangel Decl. at 36.

[7]    Both Plaintiff and Defendant attached copies of Plaintiff's deposition transcript. Plaintiff's copy is identified as Mahil Depo. I, and Defendant's copy is identified as Mahil Depo. II.

and that Plaintiff sent Lo a text at 3:00 a.m. with an example of one of her documentations. *Id.* Zau initially asked Lo for information about her phone call with Plaintiff and later forwarded the email to Jefferson and Elardo. *Id.* at 39; Zau Depo. at 199–200. Plaintiff disputes Lo's version of the conversation, stating Lo was extremely upset and complained about her stress and weight loss. Mahil Depo. I at 22. Plaintiff alleges she discussed stress leave with Lo but did not suggest anything illicit. *Id.* at 23–25.

In early November 2019, Plaintiff received a call from a patient, who later complained of Plaintiff's conduct. Ex. 52 to Rangel Decl. at 141. Elardo spoke to the patient about the complaint. Elardo Depo. at 47–50. Elardo did not speak with Plaintiff to hear her side. *Id.* at 49–50. There is an email chain regarding the incident between Zau, Elardo, and Shirley Fernandez, where Fernandez described the patient's story to Zau. Ex. 52 to Rangel Decl. at 142; Ex. 20 to Rangel Decl. at 44. Fernandez stated the patient reported Plaintiff "was either drunk or half asleep" and that he told her not to call back but "she was blowing up his phone at night which caused problems." *Id.* Zau forwarded the email to Elardo, who stated "[Plaintiff] was on call." Ex. 20 to Rangel Decl. at 44. Elardo emailed Jefferson regarding the event, stating "[t]his is 3 incidents with [Plaintiff] in the last 3 weeks, 2 of which are WD." Ex. 52 to Rangel Decl. at 140.

The parties dispute the circumstances of the patient call, including whether Plaintiff in fact acted inappropriately, or whether the patient could not hear Plaintiff and the call kept dropping. Mahil Depo. I at 54–55. Plaintiff testified that she was not drunk at work on that day, nor has she ever come to work drunk. *Id.* at 54. It does not appear Plaintiff was disciplined or made aware of the patient complaint, and Defendant does not dispute Plaintiff's allegation that Defendant failed to ask Plaintiff for her version of the event. *See* Elardo Depo. at 49–50; *see generally* ECF No. 47 ("Reply") at 9–10.

On November 19, 2019, Zau emailed Jefferson and Elardo describing how on November 18, 2019, Plaintiff was not managing her time efficiently, and that she was incorrect in saying there was not enough medication for a patient, when there actually was. Ex. 21 to Rangel Decl. at 46–47. Plaintiff sent an email to herself regarding the

-8-

incident, stating that she had asked Zau if she should go to lunch or finish what she was working on, and Zau responded inappropriately, telling Plaintiff she should not have to help her when doing intake and Plaintiff "should check TT and respond accordingly." Ex. 30-2 to Rangel Decl. at 83.  Plaintiff's email also alleges that later in the day, Zau helped Lo check a TPN machine, despite Zau telling Plaintiff she could not help her.  *Id.*

In early December 2019, Elardo "reviewed the monthly staffing productivity reports" and determined that the San Diego "location required only one full time pharmacy manager and one clinical pharmacist." Elardo Decl. at 3, ¶ 11.; *see also* Ex. 45 to Jefferson Decl. at 20–23. Elardo decided "that a part time pharmacist position would be eliminated pursuant to a reduction in force." Elardo Decl. at 3–4, ¶ 11.  The pharmacists were compared using a competency review which assigned each pharmacist a numerical rating, based on their performance. *Id.* at 4, ¶ 12; Ex. 22 to Rangel Decl. at 49–50. Zau provided Elardo "with the information necessary to complete the competency chart with regard to the elimination of the pharmacy position." Elardo Decl. at 4, ¶ 12.

Plaintiff's competency review was completed on December 3, 2019, and she received an average score[8] in all categories, with a note of two documented disciplinary reports. Ex. 22 to Rangel Decl. at 50.  Plaintiff received a lower score than Lo, which allegedly resulted in the decision to eliminate Plaintiff's position. Elardo Decl. at 4, ¶ 12. In email correspondence between Elardo and Jefferson dated December 6, 2019, Elardo stated her concern that Plaintiff would try to take leave if they waited to terminate her. Ex. 45 to Rangel Decl. at 128.  Per the email, Elardo planned to terminate Plaintiff on January 8, 2020. *Id.* at 126.

On December 24, 2019, Plaintiff visited Dr. Graham reporting anxiety, insomnia, and difficulty concentrating. Ex. 23 to Rangel Decl. at 3.  Dr. Graham provided a medical note dated December 24, 2019, stating: "[Plaintiff] was seen in my clinic on 12/24/2019

---

[8]    Per the competency review form, a score of two equals poor performance, a score of four equals average performance, a score of six equals good performance, and a score of eight equals superior performance. *See* Ex. 22 to Rangel Decl. at 49–51

1   at 12:00 pm.  Please excuse [Plaintiff] for her absence from work from 12/24/2019 until
2   2/4/2020."  Ex. 24 to Rangel Decl. at 54.  Plaintiff applied for medical leave that day.
3   Mahil Decl. at 2, ¶ 5.  On December 26, 2019, Zau and Jefferson received a letter that
4   Plaintiff's leave application was pending.  Ex. 25 to Rangel Decl. at 56–57; Ex. 63 to
5   Rangel Decl. at 144.

6        Lo testified that she gave her notice to resign as a Defendant employee prior to
7   Plaintiff's termination.  Deposition of Vicky Lo, ECF No. 44-4 ("Lo Depo.") at 136.  Lo's
8   official resignation letter is dated January 10, 2020, stating her last day would be January
9   21, 2020.  Ex. 43 to Rangel Decl. at 123.  However, Zau testified that Lo informed her of
10  the resignation in late December 2019.  Zau Depo. at 154–56.  Zau also testified that she
11  conveyed the news to Elardo, who replied that she would discuss it with Jefferson.  Zau
12  Depo. at 156–57, 161–62.  Elardo confirmed that Zau informed her of Lo's resignation
13  prior to Plaintiff's termination.  Elardo Depo. at 74.  Jefferson claims he learned of Lo's
14  resignation the day Plaintiff was terminated.  Deposition of Lawrence Jefferson, ECF No.
15  44-4 ("Jefferson Depo.") at 103.

16       On January 10, 2020, Elardo and Jefferson called Plaintiff and terminated her.  Ex.
17  44 to Mahil Decl. at 2–3; Elardo Depo. at 71; Jefferson Depo. at 103.  Zau's termination
18  letter to Plaintiff states she was "being terminated, pursuant to a reduction in force . . . ."
19  Ex. 44 to Mahil Decl. at 2.  Elardo testified that there was no other reason for Plaintiff's
20  termination, aside from the reduction in force—there was some discussion of Lo's
21  resignation, but it is unclear when that conversation occurred.  Elardo Depo. at 73–75.
22  Elardo claimed she did not recall discussing Lo's resignation during the call with Plaintiff,
23  but Jefferson testified that the resignation was discussed.  Jefferson Depo. at 103–104.

24       When asked why Jefferson did not reconsider reinstating Plaintiff after Lo's
25  resignation, Jefferson stated the decision to terminate her had already been made.  *Id.* at
26  106.  Jefferson also mentioned Plaintiff's problematic history and performance issues.  *Id.*
27  at 107.  Jefferson then stated Plaintiff was not terminated based on her performance issues,
28  "[b]ut her performance issues were an integral part of her [competency review] rating . .

1    . . ." *Id.*

2      On January 20, 2020, Plaintiff began seeing a psychiatrist, Dr. Preeti Mathur, for

3 her alleged depression and anxiety. Deposition of Dr. Preeti Mathur, ECF No. 46-14

4 ("Mathur Depo.") at 10–12; Ex. 81 to Rangel Decl. at 2–6. Plaintiff rated her depression

5 between a seven and eight on a scale of one to ten, which Dr. Mathur stated, was "pretty

6 high." Mathur Depo. at 12; Ex. 81 to Rangel Decl. at 2. Based on his assessment of

7 Plaintiff, Dr. Mathur diagnosed her with Major Depressive Disorder, in addition to

8 Generalized Anxiety Disorder. Mathur Depo. at 14–16; Ex. 81 to Rangel Decl. at 2. Dr.

9 Mathur concluded Plaintiff's depression was severe because he "saw her severely

10 depressed" and "[w]ith all the major depressive criteria." Mathur Depo. at 19. Dr. Mathur

11 advised Plaintiff to start intensive outpatient treatment. Mathur Depo. at 26; Ex. 81 to

12 Rangel Decl. at 5.

13      On January 30, 2020, Dr. Mathur assessed Plaintiff again—she rated her depression

14 at an eight on a scale of one to ten. Mathur Depo. at 32; Ex. 81 to Rangel Decl. at 10.

15 Plaintiff also reported anxiety, panic attacks, nightmares, insomnia, low energy, low

16 motivation, and low appetite. Mathur Depo. at 33; Ex. 81 to Rangel Decl. at 10. Dr.

17 Mathur extended Plaintiff's medical leave to May 4, 2020, "[b]ecause she needed it. She

18 was depressed and anxious." Mathur Depo. at 37; Ex. 81 to Rangel Decl. at 12. Dr.

19 Mathur listed being laid off and financial problems as Plaintiff's recent stressors. Ex. 81

20 to Rangel Decl. at 10.

21      All of this evidence is important for deciding whether Plaintiff's claims should

22 survive summary judgment.

23      **B.**    **Relevant Procedural History**

24      On August 12, 2020, Plaintiff filed her Complaint, alleging eleven claims for relief,

25 including: (1) FMLA interference; (2) CFRA interference; (3) CFRA retaliation; (4)

26 disability/perceived disability discrimination; (5) retaliation for requesting reasonable

27 accommodation; (6) failure to prevent discrimination and retaliation; (7) failure to provide

28 rest breaks or premium pay in lieu thereof; (8) failure to provide meal breaks or premium

1   pay in lieu thereof; (9) retaliation and wrongful termination; (10) wrongful termination in

2   violation of public policy; and (11) unlawful and unfair competition.   ECF No. 1

3   ("Compl.").  Plaintiff also seeks punitive damages.  *Id.* at 39.

4          On October 29, 2021, Defendant filed a Motion for Partial Summary Judgment,

5   seeking judgment on all claims for relief except those alleging: (1) failure to provide rest

6   breaks or premium pay in lieu thereof; (2) failure to provide meal breaks or premium pay

7   in lieu thereof; and (3) unlawful and unfair competition.  ECF No. 36 ("Motion").

8   **III.   LEGAL STANDARD**

9          "A party is entitled to summary judgment if the 'movant shows that there is no

10  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

11  of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir.

12  2014) (quoting Fed. R. Civ. P. 56(a)).  A fact is material if it could affect the outcome of

13  the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

14  A dispute of material fact is genuine if the evidence, viewed in light most favorable to the

15  non-moving party, "is such that a reasonable jury could return a verdict for the non-

16  moving party."  *Id.*  "The moving party initially bears the burden of proving the absence

17  of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

18  (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the moving

19  party meets its burden, the nonmoving party must go beyond the pleadings to establish a

20  genuine issue of material fact, using affidavits, depositions, answers to interrogatories,

21  admissions, and specific facts.  *Ford Motor Credit Co. v. Daugherty*, 270 F. App'x 500,

22  501 (9th Cir. 2008) (citing *Celotex*, 477 U.S. at 324); *see also* Fed. R. Civ. P. 56(c)(1)(A)

23  (purported factual disputes must be accompanied by "materials in the record, including

24  depositions, documents, electronically stored information, affidavits or declarations,

25  stipulations . . . , admissions, interrogatory answers, or other materials").

26         "The court must view the evidence in the light most favorable to the nonmovant

27  and draw all reasonable inferences in the nonmovant's favor."  *City of Pomona*, 750 F.3d

28  at 1049.  "Where the record taken as a whole could not lead a rational trier of fact to find

-12-

for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). However, the nonmoving party's mere allegation that factual disputes exist between the parties will not defeat an otherwise properly supported motion for summary judgment. *See* Fed. R. Civ. P. 56(c); *see also Phytelligence, Inc. v. Washington State Univ.*, 973 F.3d 1354, 1364 (Fed. Cir. 2020) ("Mere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (quoting *Nelson v. Pima Cmty. College*, 83 F.3d 1075, 1081–82 (9th Cir. 1996)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## IV.   DISCUSSION

Defendant moves for summary judgment, and both parties move to file certain documents and testimony under seal. *See* Motion; ECF Nos. 37 and 45.

### A. Motion for Partial Summary Judgment

Defendant requests the Court grant summary judgment as to Plaintiff's claims for: (1) FMLA interference; (2) CRFA interference; (3) CFRA retaliation; (4) disability discrimination under FEHA; (5) retaliation for requesting reasonable accommodations under FEHA; (6) failure to prevent discrimination and retaliation under FEHA; (7) retaliation in violation of California Labor Code section 1102.5; (8) wrongful termination in violation of public policy; and (9) punitive damages. *See generally* Motion. Plaintiff argues summary judgment should be denied because the evidence creates genuine disputes of material facts. *See generally* Oppo. The Court agrees.

#### i. Disability Discrimination in Violation of FEHA

A prima facia case for a FEHA-recognized mental disability requires a plaintiff prove that he or she: (1) has a mental disability; (2) is otherwise qualified to perform the job with reasonable accommodation; and (3) experienced adverse employment action as a result of the disability. *Higgins-Williams v. Sutter Medical Foundation*, 237 Cal. App. 4th 78, 84 (2015); *Faust v. California Portland Cement Co.*, 150 Cal. App. 4th 864, 886 (2007)); *see also* Cal. Gov. Code § 12940. A burden-shifting analysis is applied in

-13-

determining FEHA claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–804 (1973); *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 354 (2000). The plaintiff must first establish a prima facie case of discrimination under FEHA, and the defendant must respond with a legitimate, nondiscriminatory reason for its conduct. *McDonnell*, 411 U.S. at 792. If the defendant makes this showing, the plaintiff must then establish that the articulated reason is a pretext for prohibited discrimination. *Id.* Defendant argues Plaintiff failed to meet all elements of her claim for disability discrimination under FEHA. The Court disagrees.

### 1. *FEHA-Recognized Disability*

FEHA defines a mental disability as "having a mental or psychological disorder or condition . . . that limits a major life activity." Cal. Gov. Code § 12926. Anxiety is considered a FEHA-recognized disability. *Kailikole v. Palomar Cmty. Coll. Dist.*, 384 F. Supp. 3d 1185, 1193 (S.D. Cal. 2019).

Defendant does not dispute whether anxiety qualifies as a disability under FEHA. Instead, Defendant argues Plaintiff's alleged anxiety is not recognized by FEHA because it resulted from her inability to work under a particular supervisor, Zau. Motion at 21. Defendant explains the undisputed facts show that Plaintiff and Dr. Graham "acknowledged on several occasions, that Plaintiff was unable to work because of anxiety and stress related to Zau's standard oversight of Plaintiff's job performance." *Id.* at 21–22. Defendant relies on *Higgins-Williams*, where the Court held "[a]n employee's inability to work under a particular supervisor because of anxiety and stress related to the supervisor's standard oversight of the employee's job performance does not constitute a disability under FEHA." 237 Cal. App. 4th at 84.

Plaintiff contends she was diagnosed with Generalized Anxiety Disorder in 2016 and since then, "has required daily prescription medication . . . ." Oppo. at 23. Plaintiff explains that in October 2019, her "anxiety flared up while working under [Defendant's] unlawful conditions," which caused "her to suffer a panic attack, insomnia, depression, change in appetite, abdominal discomfort, fatigue, and difficulty concentrating to a point

that [she] was unable to work." *Id.*  Plaintiff contends she was terminated while on medical leave, and "was still suffering from anxiety despite not being at work and continued to suffer from anxiety thereafter." *Id.*  Finally, Plaintiff alleges that Defendant wrongfully relies on *Higgins-Williams*, because in that case, the plaintiff was diagnosed with an anxiety disorder only as a result of interacting with human resources and her manager. *Id.* at 22 (citing *Higgins-Williams*, 237 Cal. App. 4th at 85).  Plaintiff is correct.

In *Higgins-Williams*, the plaintiff was diagnosed with an anxiety disorder after reporting to her physician "that she was stressed because of interactions at work with human resources and her manager."  237 Cal. App. 4th at 81.  Although Plaintiff reported stress to Dr. Graham related to Zau during October and December 2019, Plaintiff's diagnosis of Generalized Anxiety Disorder predates these complaints.  Dr. Graham's deposition testimony, along with medical records, indicate that Plaintiff met the criteria for Generalized Anxiety Disorder on June 27, 2016.  Ex. 82 at Rangel Decl. at 2; Graham Depo. at 5.  Because Plaintiff was diagnosed with Generalized Anxiety Disorder before she started working for Defendant, there is a genuine dispute of material fact as to whether Plaintiff's alleged disability resulted solely from her inability to work under Zau.[9]  Accordingly, the Court **DENIES** summary judgment on the basis that Plaintiff did not have a FEHA-recognized disability.

## 2. *Defendant's Knowledge of the Alleged Disability*

To prove that an employee was terminated because of a disability, the plaintiff must show the employer had knowledge of the disability.  *Alejandro v. ST Micro Elecs., Inc.*, 129 F. Supp. 3d 898, 909 (N.D. Cal. 2015) (citing *Brundage v. Hahn*, 57 Cal. App. 4th 228, 236–37 (1997)).  An employer has knowledge of a "disability when the employee tells the employer about his condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation." *Jaco v. Winco Holdings, Inc.*, No. 1:18-cv-00301-DAD-EPG, 2022 WL 525278, at *5 (E.D. Cal. Feb. 22, 2022)

---

[9]   Plaintiff's June 27, 2016 medical note indicates Plaintiff had anxiety at another job as well and not just while working under Zau.  *See* Ex. 82 to Rangel Decl. at 2.

1    (quoting *Faust*, 150 Cal. App. 4th at 887).  "While knowledge of the disability can be

2    inferred from the circumstances, knowledge will only be imputed to the employer when

3    the fact of disability is the only reasonable interpretation of the known facts."  *Parker v.*

4    *Comcast Cable Commc'ns Mgmt., LLC*, No. 15-cv-05673-TEH, 2017 WL 2289176, at *4

5    (N.D. Cal. May 25, 2017) (quoting *Brundage*, 57 Cal. App. 4th at 237), *aff'd*, 747 F.

6    App'x 565 (9th Cir. 2018).  A professional understanding of the employee's condition is

7    not required, and "[i]t is enough to show that the defendant knew of symptoms raising an

8    inference that the plaintiff was disabled."  *Jadwin v. Cnty. of Kern*, 610 F. Supp. 2d 1129,

9    1179 (E.D. Cal. 2009) (quoting *Sanglap v. LaSalle Bank, FSB*, 345 F.3d 515, 520 (7th

10   Cir. 2003)).  "Knowledge of just the symptoms or effects of an otherwise undisclosed

11   condition is not, however, sufficient if those symptoms or effects do not raise an inference

12   that the person is disabled."  *Jadwin*, 610 F. Supp. 2d at 1179.  "A supervisor's knowledge

13   of an employee's disability is imputed to the employer . . . ."  *Alejandro*, 129 F. Supp. 3d

14   at 909.

15        Defendant argues there is "no evidence that Plaintiff ever provided [Defendant]

16   with any information that would enable it to determine that Plaintiff had a disability or

17   that she had any limitations due to a disability."  Motion at 22.   Defendant explains "[t]he

18   medical notes provided by Plaintiff's physician did not contain sufficient information to

19   put [Defendant] on notice that Plaintiff had a disability."  *Id.* at 22–23.  Defendant

20   contends that Plaintiff telling Zau "she needed to leave work early to see her physician to

21   get anxiety medication . . . ," alone, does not establish a diagnosis of a specific condition.

22   *Id.* at 23.  Defendant also argues that Zau was unaware of any alleged disability, and that

23   although Zau witnessed Plaintiff crying after issuing a verbal warning to Plaintiff, Zau

24   never witnessed a panic attack.  *Id.*

25        Defendant further argues the employees who made the decision to terminate

26   Plaintiff, "Jefferson and Elardo, were not aware that Plaintiff suffered from any alleged

27   mental disability."  *Id.* at 22.  The preliminary termination decision was made in early

28   December 2019, nearly three weeks before Plaintiff requested leave.  *Id.* at 23.  It was not

1   until December 26, 2019 that "Jefferson received a letter . . . stating that Plaintiff's request
2   for a leave of absence was pending." *Id.* at 23–24.  Defendant also argues the letter does
3   not establish Defendant's knowledge of Plaintiff's disability under FEHA.  *Id.* at 24.

4        Plaintiff argues "Zau's unequivocal admissions establish knowledge of [Plaintiff's]
5   disability, which must be imputed to [Defendant]."  Oppo. at 25.  Plaintiff explains "Zau
6   received all of [Plaintiff's] doctor's notes for time off due to her 'medical condition' and
7   'medical illness' and for medical leave, which all coincided with . . . Zau's knowledge
8   and perception that [Plaintiff] was suffering from anxiety." *Id.* at 25–26.  Plaintiff further
9   alleges Zau forwarded the doctor's notes to Jefferson and Elardo and discussed Plaintiff's
10  anxiety with these decision makers "long before they initially decided to terminate
11  [Plaintiff] via 'reduction in force.'" *Id.* at 26.  Finally, Plaintiff alleges she was terminated
12  while on leave for her illness, and that even without Zau's admissions, "the only
13  reasonable interpretation based on the circumstances," is Plaintiff's disability. *Id.* at 26.

14       Defendant replies that Plaintiff's citations to Zau's deposition testimony are
15  inaccurate, explaining the record shows "Zau was only aware that Plaintiff asked if she
16  could be excused for the day after receiving a disciplinary warning so that she could see
17  her physician to get anxiety medication."  Reply at 6.  Zau, however, "was not aware of a
18  preexisting anxiety disorder…" and there is no "evidence indicating Zau was aware at
19  any time Plaintiff was diagnosed with anxiety." *Id.* (citing Elardo Decl. at 3, ¶ 7; Jefferson
20  Decl. at 3, ¶ 13).  Defendant further argues that Zau's report to Jefferson and Elardo, by
21  itself, does not establish that Elardo and Jefferson knew Plaintiff suffered from a mental
22  disability. *Id.* at 7.

23       The Court finds a genuine dispute of material fact as to whether Defendant knew
24  of Plaintiff's alleged disability.  Zau's testimony and email correspondence show that
25  Zau, Elardo, and Jefferson likely knew of Plaintiff's anxiety. *See* Ex. 16 to Rangel Decl.
26  Zau's testimony also confirms she was aware Plaintiff was "suffering from a medical
27  condition during her time" with Defendant.  Zau Depo. at 143.  When asked what medical
28  condition Zau perceived Plaintiff had, Zau responded, "Anxiety." *Id.* at 144.  Zau claimed

-17-

1   she learned of Plaintiff's anxiety on the same day Zau gave Plaintiff a verbal disciplinary

2   warning in October 2019, when Plaintiff asked Zau if she could leave work to get anxiety

3   medication from her doctor.  *Id.* at 145.  Zau again confirmed she perceived Plaintiff as

4   having anxiety when she received Dr. Graham's medical note, after Plaintiff told Zau she

5   needed to see her doctor for anxiety medication.  *Id.* at 190.  From Zau's perspective,

6   Plaintiff "did have some anxiety based on what [Zau] observed, [including] the crying

7   before [Plaintiff] left . . . " for the day.  *Id.* at 183.

8          Although Plaintiff's doctor's notes did not state that Plaintiff suffered from anxiety,

9   Zau discussed Plaintiff's anxiety in relation to the notes in email correspondence to Elardo

10  and Jefferson.  *See* Ex. 16 to Rangel Decl. at 26, 28 (Zau stating Plaintiff needed "the rest

11  of the day off to see her MD to get anxiety meds" and how Zau could not imagine how

12  "the verbal warning would cause this much anxiety.").  Based on these emails, it appears

13  Zau, Elardo, and Jefferson could have known that the medical notes related to Plaintiff's

14  anxiety.  Zau, Elardo, and Jefferson's likely knowledge of Plaintiff's anxiety and need for

15  medication, coupled with two medical notes requiring time off work, creates a genuine

16  dispute of material fact as to whether Defendant knew Plaintiff's anxiety amounted to a

17  disability.[10]  Accordingly, the Court **DENIES** summary judgment on the basis that

18

19  _____

20  [10]     At one point, Defendant argues it was unaware of Plaintiff's alleged disability and

21  that it actually "appeared that Plaintiff intended to defraud [Defendant] by taking

22  unwarranted leave."   Motion at 14.  However, Zau's testimony creates factual disputes

23  as to whether or not Zau believed Plaintiff.  When asked whether Zau had any reason not

24  to believe that Plaintiff "was leaving work to go to her doctor and get anxiety medication,"

25  Zau responded "No."  Zau Depo. at 147.  Zau also confirmed that she did not believe

26  Plaintiff "faked her anxiety and got a doctor's note just to retaliate against [Zau]."  *Id.* at

27  184.  However, later in her deposition testimony, Zau stated her perception that Plaintiff

28  was overexaggerating her anxiety, and that Zau relayed this belief to Elardo.  *Id.* at 216.

    Zau also stated that she was not aware Plaintiff had an anxiety disorder prior to October

    18, 2019, because Plaintiff spent a lot of time on her phone and computer shopping, and

    Zau did not expect someone with anxiety to behave that way.  *Id.* at 187–88.  Therefore,

    the Court finds that genuine disputes of material fact remain as to whether or not Zau

    suspected Plaintiff of lying.

1  Defendant lacked knowledge of Plaintiff's alleged disability.

2              *3.   Qualifications to Perform Essential Functions of Job*

3         To prevail on a claim for disability discrimination under FEHA, a plaintiff must

4  show that she can perform the functions of her job with reasonable accommodation.

5  *Higgins-Williams*, 237 Cal. App. 4th at 84; *Faust*, 150 Cal. App. 4th at 886; *see also* Cal.

6  Gov. Code § 12940.  Accordingly, an employer may terminate an employee who, due to

7  a mental or physical disability, is unable to perform the essential functions or duties of

8  her position, even with reasonable accommodations.  Cal. Gov. Code § 12940(a)(2).

9  "'Essential functions' means the fundamental job duties of the employment position the

10 individual with a disability holds or desires . . . . [but] not . . . the marginal functions of

11 the position."  Cal. Gov. Code § 12926.

12        Defendant argues Plaintiff cannot establish that she was qualified to perform the

13 essential functions of her job, without reasonable accommodations.   Motion at 24.

14 Defendant explains Plaintiff was put on medical leave on December 24, 2019, and that

15 she "was not released to work until January 11, 2021." *Id.* at 24–25.

16        Plaintiff argues Defendant presented no evidence that Plaintiff was totally disabled

17 when she was terminated on January 10, 2020.  Oppo. at 23–24.  Plaintiff argues

18 Defendant cites only to Plaintiff's post-termination, February 3, 2020, claim for disability

19 benefits, which was made "*after* she was diagnosed with a 'major depressive disorder.'"

20 *Id.*  Plaintiff contends that as of January 10, 2020, she was qualified to perform her job

21 with the reasonable accommodation of medical leave through February 3, 2020. *Id.* at

22 24.  Plaintiff contends Defendant relies on its own wrongful termination in arguing

23 Plaintiff could not have returned to work. *Id.*  Plaintiff explains that at the time she

24 required medical leave on December 24, 2019, "Dr. Graham believed [Plaintiff] would

25 be able to return to work on February 4, 2020 . . . ." *Id.*  Plaintiff's need for additional

26 leave was caused by her termination and her resulting financial problems. *Id.*  Plaintiff

27 further argues that even if she would have required additional leave, she "had six weeks

28 of FMLA/CFRA leave remaining," and Defendant was under "a duty to engage in the

1   interactive process to determine whether extended leave . . . could have been granted as a

2   reasonable accommodation." *Id.*

3         Defendant replies that nothing in the record supports Plaintiff's contentions, and

4   that she "was diagnosed with major depressive disorder on October 29, 2019, long before

5   her termination."  Reply at 8.  Defendant contends the evidence does not show that her

6   leave was extended because of her termination and rather, "that she went on medical leave

7   and was laid off."  *Id.*  Defendant claims the only evidence supporting Plaintiff's

8   contention is her own deposition testimony.  *Id.* at 8–9.

9         In pleading her disability discrimination claim under FEHA, Plaintiff points to her

10  medical leave as the reasonable accommodation she required.  Compl. at 25, ¶ 88 ("Despite

11  her mental disability, Plaintiff was able to perform her essential job duties, at times with

12  and at times without reasonable accommodations including a brief medical leave of

13  absence.").  Dr. Graham's testimony and the medical note she wrote on December 24,

14  2019, indicate that Plaintiff was scheduled to return to work within the 12-week leave

15  period, on February 4, 2020.  Ex. 24 to Rangel Decl. at 54; Graham Depo. at 33–34; *see*

16  *also* 29 U.S.C. § 2612(a)(1)(D) (allowing 12-weeks of leave for a serious health condition).

17  The record shows Plaintiff was terminated on January 10, 2020, prior to her leave expiring

18  and before she was set to come back to work on February 4, 2020.  *See* Ex. 24 to Rangel

19  Decl. at 54.  Plaintiff points to her termination as the reason for her leave being extended,

20  arguing that but for her termination and resulting financial stressors, she would have been

21  able to perform the essential functions of her job.  *See* Oppo. at 24.  Plaintiff's argument is

22  consistent with the evidence, because on January 30, 2020—after Plaintiff was

23  terminated—Dr. Mathur documented the decision to extend Plaintiff's leave to May 4,

24  2020.  Ex. 80 to Rangel Decl. at 209.  Dr. Mathur listed Plaintiff's termination and financial

25  problems as recent stressors.[11]  *Id.* at 207.

26

27  [11]   The parties dispute when Plaintiff was diagnosed with Major Depressive Disorder

28  but for purposes of deciding Defendant's Motion for Partial Summary Judgment, the Court

Defendant has set forth no evidence that Plaintiff could not have fulfilled the essential functions of her job when the termination occurred.  *See Grantz v. State Farm Mut. Auto. Ins. Co.*, 420 F. App'x 692, 695 (9th Cir. 2011) (citing *Nadaf–Rahrov v. Neiman Marcus Grp., Inc.*, 166 Cal. App. 4th 952, 963 (2008)) ("[W]here an employer believes that an employee will not be able to perform the essential functions of the job upon expiration of statutory leave, the employer does not violate the FEHA by terminating the employee.").  Therefore, although Plaintiff's leave was extended, there is a genuine dispute regarding the reason for the extension and whether she would have been able to return to work within the requisite 12 week-period, had she not been terminated.  Accordingly, the Court **DENIES** summary judgment on the question of whether Plaintiff could perform the essential functions of her job.

### ii.  <u>Pretext for Alleged Discrimination and Retaliation</u>

"In an employment discrimination case, the employee must first establish a prima facie [case] of wrongful discrimination. If she does so, the burden shifts to the employer to show a lawful reason for its action. Then the employee has the burden of proving the proffered justification is mere pretext." *Gonzales v. Metpath, Inc.*, 214 Cal. App. 3d 422, 426 (Cal. Ct. App. 1989); *see also Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007); *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1108 (2007). "Pretext may be inferred from the timing of the discharge decision, the identity of the decision maker, or by the discharged employee's job performance before termination." *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 216 (1999).

A plaintiff can also demonstrate pretext by showing the "proffered reason had no basis in fact . . . [,] did not actually motivate the discharge, or . . . was insufficient to motivate the discharge." *Id.*   That evidence of pretext "may be either direct or circumstantial, and very little is required." *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996) (citing *Messick v. Horizon Indus. Inc.*, 62 F.3d 1227, 1229; (9th

---

finds the dispute irrelevant.  The Court relies on Dr. Mathur's note extending her medical leave and his documentation of recent stressors.

Cir. 1995); *Caldwell v. Paramount Unified Sch. Dist.*, 41 Cal. App. 4th 189, 197 (1995), *as modified on denial of reh'g* (Jan. 17, 1996)).   "Where the evidence of pretext is circumstantial, rather than direct, the plaintiff must present 'specific' and 'substantial' facts showing that there is a genuine issue for trial."  *Noyes*, 488 F.3d at 1170 (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998), *as amended* (Aug. 11, 1998)).

Defendant argues that because Plaintiff cannot show a pretext for discrimination or retaliation, summary judgment should be granted as to Plaintiff's claims for: (1) CFRA retaliation, (2) disability discrimination under FEHA, (3) retaliation for requesting reasonable accommodation under FEHA, and (4) retaliation in violation of California Labor Code section 1102.5.  Motion at 25.  Defendant contends Plaintiff was terminated for poor performance and due to a reduction in force, and not because of discrimination or retaliation.  *Id.* at 26–28.  Defendant cites Plaintiff's own perception of the quality of her work claiming Plaintiff admits: (1) responsibility "for two late infusion deliveries on October 18, 2019;" and (2) regarding the written Disciplinary Action dated October 29, 2019, that a potential HIPAA violation could have occurred.  *Id.* at 26.  Defendant also contends that pretext focuses solely on the decision-maker—in this case, Zau—whose "unrefuted testimony is that she observed Plaintiff's deficient work performance."  *Id.* at 26–27.  Zau's decision to give Plaintiff a "low rating on the competency review related to the reduction in force" was because of Plaintiff's performance deficiencies.  *Id.* at 27.

Defendant maintains "Plaintiff's two disciplinary warnings and poor time management skills paired with complaints from coworkers and patients establish [Defendant's] legitimate, nonretaliatory reason for terminati[on] . . . ."  *Id.* at 28.  Defendant reiterates that it was unaware of Plaintiff's alleged disability and requested leave when the termination decision was made, and it "appeared that Plaintiff intended to defraud [Defendant] by taking unwarranted leave."  *Id.*  Defendant also argues Plaintiff was not terminated for the complaint she made regarding employees being overworked, unable to take breaks, and for bringing up the class action suit against Rite Aid for similar

-22-

allegations.  *Id.*  Defendant explains Lo was the first person to raise the missed breaks issue and Lo was not disciplined as a result.  *Id.*

Plaintiff argues Defendant's reduction in force argument fails because Defendant's goal was to reduce its three-pharmacist staff to two pharmacists total, but that Lo voluntarily resigned prior to Plaintiff's termination.  Oppo. at 26–27.  Plaintiff argues that Lo's resignation accomplished Defendant's goal "without the need for layoff, and [Defendant] had no good faith, legitimate basis for a 'reduction in force.'"  *Id.* at 27.

Regarding her performance, Plaintiff alleges that her "average" competency review rating refutes Defendant's alleged claim that Plaintiff had "significant performance issues."  *Id.* at 26–27.  Plaintiff states that "prior to October 2019, [Plaintiff] had only positive performance reviews, no discipline, and received merit increases."  *Id.* at 28.  However, when Plaintiff revealed her disability to Zau and took a few days off, Zau "made her intentions known – she had been 'too nice' and was now going to 'document all incidences' in her quest to get rid of [Plaintiff]."  *Id.*  Plaintiff argues "Zau followed through with her threat and papered [Plaintiff's] file with alleged performance issues, most of which were never discussed with [Plaintiff]."  *Id.*  Plaintiff also contends Jefferson emailed Plaintiff about an open pharmacist position, which conflicts with Defendant's assertion "that 'performance' was the real reason for termination."  *Id.*  Finally, Plaintiff argues the timing of Defendant's termination decision—after Plaintiff disclosed her disability to Defendant and during Plaintiff's medical leave—provides additional evidence of pretext.  *Id.*

The Court finds a genuine dispute of material fact as to whether a pretext for discrimination or retaliation existed when Defendant decided to terminate Plaintiff.  The evidence suggests that the objective of Defendant's reduction in force was achieved when Lo informed Zau in late December 2019 of her intent to resign.  Zau Depo. at 154–56.  Zau then relayed the news to Elardo.  Elardo Depo. at 74.  Although Defendant cites Plaintiff's significant performance issues as its reason for moving forward with the termination, Plaintiff provides evidence of average and good performance that conflicts

-23-

with Defendant's evidence of poor performance.  *See, e.g.*, Exs. 8, 9, 11, 12, 77, 82 to Rangel Decl.   Furthermore, Zau's testimony, email correspondence, and notes in Plaintiff's Performance Reviews and Disciplinary Actions are conflicting.  For example, regarding the incident between Plaintiff and Vincent Sanque, Zau saw both sides and even appeared to defend Plaintiff in an email to Elardo.  Ex. 77 to Rangel Decl. at 2.  Zau also gave Plaintiff a positive 2018 Annual Performance Review, despite later stating, in an October 2019 email, that Plaintiff had yelled at her in 2018.  Ex. 16 to Rangel Decl. at 28.  Zau's texts with Plaintiff in 2019 indicate that Plaintiff was a team player and coordinated birthday gifts/decorations for another employee, which conflicts with Zau's October 2019 statements that Plaintiff was bringing down team morale.  *See, e.g.*, Ex. 42 to Rangel Decl. at 108–110, 115.  Zau began reporting issues with Plaintiff after she commented on the Rite Aid and Kaiser lawsuits during a staff meeting in September or October 2019.  When Zau received Plaintiff's medical note in October 2019, Zau's email to Jefferson and Elardo show that Zau was upset about Plaintiff taking time off work.  Ex. 16 to Rangel Decl. at 28.  Pursuant to the reduction in force, Zau supplied the information for Plaintiff's competency review score, which designated Plaintiff's performance as average in all categories, when it could have been designated as poor.  Ex. 2 to Rangel Decl. at 50.

In addition, despite Defendant's argument that it appeared Plaintiff planned to take unwarranted leave to defraud Defendant, Plaintiff provided medical notes and at one point, Zau testified that she did not believe Plaintiff "faked her anxiety and got a doctor's note just to retaliate against [Zau]." Zau Depo. at 184.  This conflicts with Zau's email correspondence stating her belief that Plaintiff was retaliating against her by getting a doctor's note to take time off work.[12]  Ex. 2 to Rangel Decl. at 50.

Given the timing, the evidence is consistent with Plaintiff's claim of pretext that Defendant discriminated and/or retaliated against Plaintiff after she took time off work for her alleged disability, and after making certain comments in a staff meeting.  However,

---

[12]     These are just some examples of Zau's conflicting testimony and prior statements.

-24-

the evidence is also consistent with Defendant's explanation that around September and October of 2019, Plaintiff began having performance issues.  Because the evidence supports both Defendant's explanation and Plaintiff's claim of pretext, there remains a genuine dispute.  Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment with respect to pretext.

### iii.   Interference with and Retaliation for Protected Leave

To establish a prima facie case for FMLA and CFRA[13] interference, a plaintiff must show: "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Sanders v. City of Newport*, 657 F.3d 772, 778 (9th Cir. 2011) (citations omitted).  A claim for retaliation in violation of the CFRA requires a plaintiff to show he or she "suffered from an adverse employment action because he or she exercised the right to take CFRA leave." *Rogers v. Cnty. of Los Angeles*, 198 Cal. App. 4th 480, 491, 492–493 (2011).

Defendant argues Plaintiff cannot demonstrate she was terminated because she took leave, given that Defendant learned of Plaintiff's CFRA application after it decided to terminate her.  Motion at 25.  Defendant further argues Plaintiff cannot establish her claims for FMLA and CFRA interference because the reduction in force "would have occurred whether or not Plaintiff went on FMLA leave." *Id.* at 30.  Defendant contends it was entitled to terminate Plaintiff pursuant to the reduction in force, despite Lo's impending resignation, because of Plaintiff's performance issues.  *Id.* at 31.  Finally, Defendant argues dismissing Plaintiff's CFRA and FMLA claims is appropriate, because Plaintiff's leave would have expired before she was released to return to work.  *Id.*

Plaintiff argues that on October 29, 2019, Defendant was notified that Plaintiff's

---

[13]   Defendant consolidated the analysis for FMLA and CFRA interference based on *Richey v. AutoNation, Inc.*, which states that "courts use language from the FMLA and CFRA interchangeably." 60 Cal. 4th 909, 919 (2015).  The Court agrees.

doctor recommended medical leave.  Oppo. at 28. Plaintiff further contends that on December 6, 2019, when the decision to terminate Plaintiff was made, Elardo expressed her concern that the termination should occur quickly because she was worried Plaintiff would take leave. *Id.* at 28–29.  Finally, Plaintiff argues that after learning of Plaintiff's leave, Lo resigned and Defendant made a "second decision to move forward with [the] termination under the guise of a 'reduction in force,' even though that reduction in force was no longer necessary." *Id.* at 29.  Plaintiff asserts her "alleged layoff was not legitimate," because had Plaintiff not been on leave, Lo's resignation would have prevented her termination. *Id.* at 30–31.  Finally, Plaintiff challenges Defendant's allegations that Plaintiff was having performance issues. *Id.* at 31.

The Court finds a genuine dispute of material fact as to whether Defendant knew of Plaintiff's leave application when deciding to terminate her on January 10, 2020, and whether Defendant interfered with Plaintiff's leave.  There is evidence Defendant knew Plaintiff intended to take leave when Elardo and Jefferson made the preliminary decision to terminate Plaintiff on December 6, 2019.[14]  More significant, however, is Zau and Elardo's deposition testimony, which establishes they learned of Lo's resignation in late December 2019.  *See* Zau Depo. at 154–56; Elardo Depo. at 74.  Defendant relies on Plaintiff's alleged performance issues[15] in justifying its choice to move forward with the

---

[14]    Zau's deposition testimony indicates that during October 2019, after Plaintiff took a few days off work, Plaintiff asked about the company's medical leave policy and Zau forwarded Plaintiff an email from Human Resources informing her of such. Zau Depo. at 217–18.  At some point after that, Zau recalls Plaintiff telling her "that she would not be taking medical leave." *Id.* at 218.  In addition, on December 6, 2019, the day Jefferson and Elardo decided to terminate Plaintiff, Elardo relayed her concern to Jefferson that Plaintiff may "try and take a leave if we wait until the first of the year." Ex. 45 to Rangel Decl. at 128.  Although Plaintiff had not yet filed for leave, the December 6, 2019 email conversation show that Jefferson and Elardo were aware Plaintiff was considering taking leave when they first decided to terminate her. *See id.* at 128.
[15]    In addition, although Jefferson testified that Plaintiff was not terminated because of her performance issues, Jefferson also stated Plaintiff was terminated after Lo's

-26-

reduction in force.  While this reliance may be legitimate, Defendant became aware of Plaintiff's leave application prior to terminating her—and after learning of Lo's resignation—meaning Defendant decided to move forward with Plaintiff's termination, despite already achieving the objective of its reduction in force.  This supports Plaintiff's explanation that there was a second decision to terminate Plaintiff that occurred after she requested leave.  Furthermore, as stated above, the extent and circumstances of Plaintiff's performance issues are in dispute.  *See supra* Part IV.A.ii.  As to Defendant's argument that Defendant did not interfere with Plaintiff's leave, because Plaintiff was not cleared to return to work until January 2021, the Court disagrees for the same reasons stated above.  *See supra* Part IV.A.i.3.  Accordingly, summary judgment is **DENIED** as to Plaintiff's FMLA and CFRA claims.

### iv. <u>Failure to Prevent Discrimination and Retaliation and Unlawful Conduct in Violation of Public Policy</u>

Defendant argues that "[b]ecause [Plaintiff's] discrimination and retaliation claims fail, so too does" Plaintiff's claim for discrimination and retaliation in violation of California Government Code section 12940(k).  Motion at 29.  Defendant makes the same argument respecting Plaintiff's claim for violation of public policy, stating "it is derivative of her claims for discrimination and retaliation."  *Id.*  Because the Court determined there are genuine disputes of material facts regarding Plaintiff's discrimination and retaliation claims, the Court **DENIES** summary judgment as to Plaintiff's derivative claims.

### v. <u>Punitive Damages</u>

A plaintiff is entitled to punitive damages, "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice" by "an officer, director, or managing agent of the corporation."  Cal. Civ. Code § 3294(a)–(b).  Managing agents "include only those corporate employees who exercise substantial independent authority and judgment in their corporate decision making so that their

---

resignation, because of her problematic history and performance issues.  Jefferson Depo. at 107.

decisions ultimately determine corporate policy." *White v. Ultramar, Inc.*, 21 Cal. 4th 563, 566–67 (1999).  There is no statutory definition for "corporate policy" under FEHA, but in *Cruz v. HomeBase*, the Court defined it as "the general principles which guide a corporation, or rules intended to be followed consistently over time in corporate operations."  83 Cal. App. 4th 160, 167 (2000).  The individual's level in the corporate hierarchy is not critical to the analysis, but "the degree of discretion the[y] . . . possess in making decisions that will ultimately determine corporate policies" is.  *Cortez v. Chipotle Mexican Grill, Inc.*, No. 17-cv-0479-87-GW-JPRx, 2018 WL 6071093, at * 16 (C.D. Cal. Aug. 9, 2018) (citing *Muniz v. UPS*, 731 F. Supp. 2d 961, 976 (N.D. Cal. 2010).  "The scope of a corporate employee's discretion and authority under our test is therefore a question of fact for decision on a case-by-case basis."  *Id.*

Defendant argues Plaintiff cannot recover punitive damages, because she fails to "establish 'through clear and convincing evidence' that an 'officer, director, or managing agent' of [Defendant] acted with oppression, fraud, or malice.'"  Motion at 31.  Defendant explains that "Jefferson and Elardo made the decision to terminate Plaintiff and they are not officers, directors or managing agents," meaning they did not possess the requisite authority over decisions affecting Defendant's policies.  *Id.* at 32.

Plaintiff argues Defendant is downplaying Jefferson and Elardo's roles, and that the argument relies on "their own self-serving declarations," which are "not sufficient to summarily dismiss punitive damages . . . ."  Oppo. at 31.  Plaintiff further argues Elardo is the "Senior Director of Operations" and integral to Defendant's business because Elardo "was responsible for the overall financial health of [Defendant's] San Diego and Riverside locations and had substantial discretionary authority" regarding budgets and production metrics, "including reducing staff to meet those metrics."  *Id.*  Plaintiff contends Jefferson is a Senior Human Resources Business Partner and "also had substantial discretionary authority in 'advis[ing] on and facilitating organization changes,' including reductions in force."  *Id.*

-28-

Defendant replies that Plaintiff submitted no "evidence indicating that Elardo or Jefferson had substantial discretionary authority over significant aspects of [Defendant's] business **that ultimately determined corporate policy**." Reply at 14. Defendant argues Elardo and Jefferson "affirmatively testified they do not have substantial discretionary authority over [Defendant's] business," and that Plaintiff has not challenged "or offered any evidence to dispute this testimony." *Id.* Finally, Defendant contends that neither Elardo nor Jefferson's responsibilities included "independent authority and judgment in corporate decision-making" to Defendant's corporate policies. *Id.*

Both Elardo and Jefferson's Declarations state they were not officers or directors of Defendant, and that they had no substantial discretionary authority over decisions affecting Defendant's policies. Elardo Decl. at 2, ¶ 4; Jefferson Decl. at 2, ¶ 6. Jefferson states he "provide[s] advice and facilitate[s] organizational changes such as department restructures, severances, redeployments and reductions in force." Jefferson Decl. at 2, ¶ 4. Jefferson also maintains that pursuant to Elardo's assessment, regarding the need for a reduction in force, he agreed it was appropriate to address Defendant's staffing needs. *Id.* at 4, ¶ 17. Elardo states her job duties include oversight of operation performance, ensuring patient safety and satisfaction, driving financial performance of local offices, managing controllable expenses, and more. Elardo Decl. at 2, ¶ 3.

Plaintiff submitted Jefferson and Elardo's job descriptions, which do not directly state that Jefferson and Elardo have discretion when it comes to corporate policies. *See* Exs. 50 and 75 to Rangel Decl. However, Jefferson's responsibilities include implementing and communicating policies, complying with policies, and "adapting activities due to changing assumptions and direction." Ex. 50 to Rangel Decl. at 138. Jefferson is also required to "advise and facilitate organizational changes to business model, organization and function alignments, and core HR activities," and to "[a]nticipate the evolving needs of the business, coach and counsel leaders and manager, and help to lead change efforts." *Id.* Elardo's responsibilities include ensuring compliance with corporate policies, overseeing operational performance, and driving financial performance.

-29-

1  Ex. 75 to Raglen Decl. at 154.   Elardo was also charged with "[o]verall revenue

2  accountability in a single location of up to $40 million annually." *Id.*   Regarding the

3  reduction in force, Elardo is the person who determined it was necessary, based on her

4  review of the monthly staffing productivity reports.   Elardo Decl. at 3–4, ¶ 11.

5        The extent of Jefferson and Elardo's responsibilities as they pertain to discretion

6  over corporate policies remains unclear.   Jefferson and Elardo's declarations and testimony

7  state legal conclusions that they are not managing agents of Defendant.   Alone, these

8  statements do not suffice to succeed on summary judgment.   *Salgado v. Iqvia, Inc.*, 459 F.

9  Supp. 3d 1318, 1339 (S.D. Cal. 2020).   However, it is clear that Jefferson and Elardo

10 decided to terminate Plaintiff as part of Elardo's decision to impose a reduction in force.

11 Many federal courts cite *White*, where the California Supreme Court held that when a

12 supervisor of eight retail stores and sixty-five employees fired an employee "for testifying

13 at an unemployment hearing, [she] exercised substantial discretionary authority over

14 decisions that ultimately determined corporate policies."   21 Cal. 4th at 577.   Conversely,

15 the Court also held that supervision of a plaintiff and the ability to fire him or her, alone,

16 is insufficient to make the supervisor a managing agent.   *Id.*; *see also Van Osten v. Home

17 Depot, U.S.A., Inc.*, No. 19-cv-02106-TWR-BGS, 2021 WL 3913483, at *16 (S.D. Cal.

18 Aug. 27, 2021).   The Ninth Circuit held that an individual was a managing agent, where

19 "[h]e exercised substantial discretion in upgrading and downgrading employee job levels,

20 and . . . decid[ed] whether and how to conduct layoffs."   *Lee v. TRW, Inc.*, 361 F. App'x

21 770, 773 (9th Cir. 2010).   The Court explained these decisions were of the type that affect

22 significant aspects of business.   *Id.*

23        Plaintiff points to Elardo being responsible for the financial health of two Defendant

24 locations, San Diego and Riverside, but neither Plaintiff nor Defendant cite to the total

25 number of people Elardo[16] or Jefferson oversaw.   Although not critical to the analysis,

26 federal courts may consider the number of employees overseen or percentage of stores

27

28 [16]      Elardo's deposition testimony establishes that she had five direct reports but does
not provide the total number of a people she oversaw.   Elardo Depo. at 5.

-30-

managed when deciding whether an individual is a managing agent.  *Wheeler v. Home Depot U.S.A., Inc.*, No. 15-cv-2236-CAB-AGS, 2020 WL 12835895, at *4 (S.D. Cal. Nov. 23, 2020) (noting that although the supervisor managed eleven stores, that constituted only "one half of a percent of . . . store locations."); *Cortez*, No. 17-cv-0479-87-GW-JPRx, 2018 WL 6071093, at * 16 ("Managing less than one percent of Defendants' restaurants and supervising less than one percent of Defendants' employees does not evidence 'substantial discretionary authority over significant aspects of a corporation's business.'").  *But see Salgado*, 459 F. Supp. 3d at 1340 ("[T]he fact that an employee 'supervised a small percentage' of the defendant's employees is not sufficient to avoid trial on whether he was a managing agent.").

Defendant argues the burden is on Plaintiff to provide clear and convincing evidence at this stage in the proceedings, but as the party moving to dismiss punitive damages, "[Defendant] has the initial burden of establishing the nonexistence of any triable issue of material fact."  *Wheeler*, No. 15-cv-02236-CAB-AGS, 2020 WL 12835895, at *4; *see also Salgado*, 459 F. Supp. 3d at 1338.  Although Plaintiff failed to provide additional details to aid the Court in its analysis, Defendant provided only conclusory arguments and vague descriptions of Elardo and Jefferson's responsibilities.  Because the initial burden falls on Defendant,[17] and Defendant failed to establish there is no triable issue of material fact, the Court **DENIES** summary judgment as to Plaintiff's claim for punitive damages.  *Salgado*, 459 F. Supp. 3d at 1340–41 (holding the defendant failed to meet "its burden of establishing there [wa]s no disputed issue of material fact" when insufficient information was provided to determine whether an individual served as a managing agent).

**B.  Motions to File Documents Under Seal**

Except for certain documents "traditionally kept secret," federal courts begin a sealing analysis with "a strong presumption in favor of access to court records."  *Foltz v.*

---

[17]   As to Defendant's argument that it did not engage in oppression, fraud, or malice, the Court already determined there are triable issues of fact regarding the reason for Plaintiff's termination.  *See supra* Part IV.A.ii.

*State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  A party seeking to seal a judicial record must "articulate [] compelling reasons supported by specific factual findings," *id.*, that outweigh the general history of access and the public policies favoring disclosure, such as the "public interest in understanding the judicial process." *Hagestad v. Tragesser*, 49 F.3d 1430, 1434 (9th Cir. 1995).  The Court "conscientiously balance[s] . . . the competing interests" of the public and the party who seeks to keep certain judicial records secret.  *Foltz*, 331 F.3d at 1135.  After considering these interests, if the Court decides to seal certain judicial records, it "base[s] its decision on a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture." *Hagestad*, 49 F.3d at 1434; *see also Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006) (applying the compelling reasons standard to dispositive motions). "Courts routinely conclude that 'the need to protect medical privacy qualifies as a compelling reason for sealing records.'"  *Pratt v. Gamboa*, No. 17-cv-04375-LHK, 2020 WL 8992141, at *2 (N.D. Cal. May 22, 2020) (internal quotations omitted) (quoting *Steven City Broomfield v. Aranas*, No. 17-cv-00683-MMD-WGC, 2020 WL 2549945, at *2 (D. Nev. May 19, 2020)).

Defendant seeks to seal: (1) Exhibits 15, 19, and 80 to the Declaration of Vidaur Durazo, ECF No. 36-6; and (2) excerpts from the depositions of Dr. Graham and Dr. Mathur.  ECF No. 37 at 2–3.  The sealed documents are lodged as ECF No. 38.  Plaintiff seeks to seal: (1) Exhibits 15, 19, 23, 34, 35, 36, 48, 49, 77, 80, 81, and 82 to the Rangel Decl.; and (2) excerpts from the depositions of Plaintiff, Dr. Graham, and Dr. Mathur.  ECF No. 45 at 3.  The sealed documents are lodged as ECF No. 46.

Both Plaintiff and Defendant argue the documents they seek to seal "contain Plaintiff's medical records from doctors' offices or medical institutions and testimony regarding Plaintiff's medical treatment." ECF No. 37 at 3; ECF No. 45 at 3.  They further argue the documents "have been designated as either 'Confidential' or 'Confidential, Attorneys' Eyes Only' by Plaintiff."  ECF No. 37 at 3; ECF No. 45 at 3–4.

Because the information Defendant seeks to seal contains Plaintiff's personal and

-32-

confidential medical information, the parties' Motions to File Under Seal are **GRANTED**. The Clerk is directed to file under seal unredacted versions of the documents and Exhibits Lodged as ECF Nos. 38 and 46.  However, certain facts from these sealed documents—that the parties refer to in their unsealed briefing and necessary to the Court's analysis—will not be sealed in this Court's order.  *See Colwell v. Bannister*, 763 F.3d 1060, 1064 n.1 (9th Cir. 2014) (holding the "medical records filed under seal [will] remain under seal except as to facts discussed herein.").

**V.   CONCLUSION**

For the reasons set forth above, the Court rules as follows:

1. Defendant's Motion for Partial Summary Judgment is **DENIED**; and

2. The parties' Motions to File Documents Under Seal are **GRANTED**.

**IT IS SO ORDERED.**

DATED:    April 15, 2022

**HON. ROGER T. BENITEZ**
United States District Judge

-33-